People v Ruffin (2021 NY Slip Op 01163)





People v Ruffin


2021 NY Slip Op 01163


Decided on February 25, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: February 25, 2021

111157

[*1]The People of the State of New York, Respondent,
v
Earnest T. Ruffin, Appellant.

Calendar Date: January 7, 2021

Before: Garry, P.J., Egan Jr., Lynch, Clark and Reynolds Fitzgerald, JJ.


Theresa M. Suozzi, Saratoga Springs, for appellant.
Karen A. Heggen, District Attorney, Ballston Spa (Gordon W. Eddy of counsel), for respondent.



Lynch, J.
Appeal from a judgment of the County Court of Saratoga County (Murphy III, J.), rendered March 28, 2019, upon a verdict convicting defendant of the crimes of criminal possession of a weapon in the second degree, criminal possession of a weapon in the third degree and criminal mischief in the fourth degree and the violation of unlawful possession of marihuana.
In January 2018, police responded to a 911 call placed by the victim, who reported that defendant had kicked in her apartment door and may have been armed with a weapon. Upon responding to the scene, police apprehended defendant and seized a duffel bag from a stairwell near the victim's apartment, which contained, among other things, various types of ammunition, a Springfield Armory handgun and a black Mossberg shotgun. In connection therewith, defendant was charged by indictment with burglary in the second degree (count 1), criminal possession of a weapon in the second degree (count 2), criminal possession of a weapon in the third degree (count 3), criminal possession of a weapon in the fourth degree (count 4), criminal mischief in the fourth degree (count 5) and unlawful possession of marihuana (count 6).[FN1] Defendant moved to suppress the evidence seized from the duffel bag and requested a Mapp/Dunaway hearing to determine the admissibility thereof. County Court summarily denied defendant's motion, finding that he failed to assert any expectation of privacy in the duffel bag that would entitle him to a hearing on the issue. Thereafter, County Court partially granted the People's Sandoval and Molineux proffers, allowing them to submit certain evidence regarding defendant's prior convictions, statements he had made on telephone calls while incarcerated pending trial and photographs seized from his cell phone.
Defendant's first trial ended in a mistrial and he was retried on the charges in January 2019. County Court's Sandoval and Molineux rulings were incorporated into the retrial and defendant admitted on the record that he had previously been convicted of manslaughter in the first degree (see Penal Law § 125.20 [1]). Following completion of the retrial, defendant was acquitted of count 1 and convicted of counts 2, 3, 5 and 6.[FN2] He was sentenced, as a second violent felony offender, to a prison term of 15 years, with five years of postrelease supervision, upon the conviction of criminal possession of a weapon in the second degree and to lesser concurrent terms of incarceration or time served on the remaining convictions.[FN3] Defendant appeals.
Defendant contends that the verdict on counts 2 and 3 of the indictment — charging criminal possession of a weapon in the second and third degrees — is against the weight of the evidence because the People failed to prove that he had knowledge of the handgun found in the duffel bag or that he had constructive possession of it. We disagree. When conducting a weight of the evidence review, we must "view the evidence in a neutral light and determine [*2]first whether a different verdict would have been unreasonable and, if not, [then] weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Caden N., 189 AD3d 84, 89 [2020] [internal quotation marks and citations omitted]; see People v Callahan, 186 AD3d 943, 943-944 [2020]).
As relevant here, "[a] person is guilty of criminal possession of a weapon in the second degree when . . . such person possesses any loaded firearm" (Penal Law § 265.03 [3]).[FN4] A "[l]oaded firearm" includes "any firearm loaded with ammunition or any firearm which is possessed by one who, at the same time, possesses a quantity of ammunition which may be used to discharge such firearm" (Penal Law § 265.00 [15]). A person is guilty of criminal possession of a weapon in the third degree when, as relevant here, "he or she knowingly possesses any firearm and has been previously convicted of any crime" (People v McCoy, 169 AD3d 1260, 1262 [2019], lv denied 33 NY3d 1033 [2019]; see Penal Law §§ 265.01 [1]; 265.02 [1]). For both counts, "the term 'firearm' means any operable pistol or revolver" (People v McCoy, 169 AD3d at 1262; see Penal Law § 265.00 [3]; People v Longshore, 86 NY2d 851, 852 [1995]).
The possession element of such crimes "includes the Penal Law definitional component of '[v]oluntary act,' which incorporates the attribute of awareness of the possession or control" (People v Saunders, 85 NY2d 339, 341 [1995], quoting Penal Law § 15.00 [2]; see People v J.L., ___ NY3d ___, ___, 2020 NY Slip Op 07663, *4 [2020]). Possession is voluntary when the defendant possesses the weapon "for a sufficient period to have been able to terminate the possession" (People v J.L., 2020 NY Slip Op 07663 at *5 [internal quotation marks, emphasis and citation omitted]). The People may proceed upon a theory of constructive possession, which requires proof that the "defendant exercised dominion and control over the contraband or the area where the contraband was found" (People v Dawson, 110 AD3d 1350, 1352 [2013] [internal quotation marks, brackets and citations omitted], lv denied 23 NY3d 1035 [2014]; see People v McCoy, 169 AD3d at 1262).
At trial, the People entered into evidence the victim's 911 call pertaining to the incident. On the call, the victim stated that her "boyfriend [had] just broke[n] [her] door open" and had pushed her to the floor, prompting her to leave her apartment. She explained that she was sitting in her car at the time of the call, identified her boyfriend as defendant, and relayed her concern that defendant had a weapon "in his bag," stating that she was "just go[ing to] drive [be]cause if he [had] a gun [she] [didn't] want him to shoot near [her] car." A neighbor of the victim testified that, upon hearing a commotion outside of her apartment, she looked through the peephole of her front [*3]door and, as relevant here, observed a man leaving the victim's apartment with a "black big bag." According to the neighbor, the man went downstairs with the bag, placed it down and stood by it.
State Trooper Kyle Conlon arrived on the scene as the incident was still unfolding and observed the victim inside of a parked SUV pointing at a man who matched the description of her boyfriend as relayed in the 911 call. Conlon observed the man "walking off the steps or the stoop area . . . towards the sidewalk" and away from an area that contained a duffle bag, explaining that the victim was "pointing at [the man] in relation to the bag." After that individual was apprehended, a pat-down search of his person yielded, among other things, a driver's license bearing defendant's name, as well as a small amount of marihuana and a ski mask. Police officers later confirmed that the individual apprehended was defendant.
Police located a black duffel bag on the steps outside of the apartment complex, which contained clothing, sneakers, two masks in the shape of skulls (one of which was silver in color and the other blue), ammunition, a handgun magazine, a Springfield Armory XD 40 handgun and a Mossberg shotgun. Multiple police officers testified that, from the time they located the duffel bag until the time that defendant was placed under arrest, they did not observe any other civilians in the vicinity of the bag. The victim's neighbor also testified to that affect. Forensic analysis of the items found in the bag did not reveal any identifiable fingerprints or DNA evidence, other than indicating that male DNA was present on the grip of the handgun and on one of the masks. Police later identified the ammunition contained in the bag as 9 millimeter and .40 caliber rounds. Although the handgun was not loaded with ammunition when it was found, an expert who test-fired it using the ammunition located in the duffel bag confirmed that it was operable. Moreover, a sergeant with the State Police Pistol Permit Unit explained that a pistol permit is required to carry a Springfield Armory handgun in New York and that no such permit had been issued in defendant's name.
The People also entered into evidence audio recordings of certain telephone calls that defendant had placed while incarcerated pending trial, during which he expressed knowledge of the duffel bag and the contents located therein. To that end, defendant asked his sister on one of the calls, "what happened to the duffel bag?" On another call, he informed his sister that there was "one silver and one blue" mask located in the bag. Moreover, defendant confirmed on other calls that the "guns" were not loaded at the time of his arrest, and that "only one gun is really illegal" and "the other one is a Mossberg." At trial, defendant's sister confirmed that certain personal items found in the bag belonged to defendant, including a belt, deodorant and sneakers. The People also entered into evidence pictures [*4]extracted from defendant's cellular phone, which were taken prior to the incident, depicting blue and silver skull masks as well as a handgun that appeared to have the "Springfield Armory" emblem engrained on it.
A different verdict would not have been unreasonable insofar as no witness saw defendant physically possessing the duffel bag or handgun located therein and given the lack of forensic evidence directly linking defendant to the handgun (see People v Sloley, 179 AD3d 1308, 1310 [2020], lv denied 35 NY3d 974 [2020]; People v Cherry, 149 AD3d 1346, 1347 [2017], lv denied 29 NY3d 1124 [2017]). Nevertheless, when weighing the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn therefrom, we conclude that the People proved beyond a reasonable doubt that defendant knowingly and voluntarily possessed the operable handgun found in the duffel bag and that the verdict on counts 2 and 3 of the indictment is not against the weight of the evidence (see People v Sloley, 179 AD3d at 1310; People v McCoy, 169 AD3d at 1263-1264).[FN5]
Contrary to defendant's contention, County Court did not abuse its discretion in summarily denying his motion for a pretrial Mapp/Dunaway hearing. A request for a suppression hearing "may be summarily denied if the motion papers do not provide a sufficient legal basis for suppression" (People v Burton, 6 NY3d 584, 587 [2006]; see CPL 710.60 [3] [a]). A defendant who seeks suppression of physical evidence has "'the initial burden of showing sufficient grounds for the motion based on sworn allegations of fact' and 'such grounds necessarily include a showing of standing'" (People v Jones, 155 AD3d 1103, 1105 [2017], lv denied 30 NY3d 1106 [2018], quoting People v Wesley, 73 NY2d 351, 358-359 [1989]). "Standing to challenge a search is not established by asserting a possessory interest in the goods seized — [the] defendant must assert a privacy interest in the place or item searched" (People v Ramirez-Portoreal, 88 NY2d 99, 109 [1996] [citation omitted]). "Where, as here, criminal charges are predicated on ordinary constructive possession principles, standing is available only if the defendant demonstrates a personal legitimate expectation of privacy in the searched [area]" (People v Jones, 155 AD3d at 1105 [internal quotation marks, emphasis and citations omitted]).
In his written motion, defendant sought suppression of the items found in the duffel bag on the basis that they were unlawfully seized "as a result of police conduct in violation of [his] substantial right to be secure against unreasonable searches and seizures." Although he asserted various grounds in support of suppression, he did not allege any facts supporting a reasonable expectation of privacy in the duffel bag, which was partially open when it was found and located in a common area. As defendant did not demonstrate standing to challenge the search, County Court did not err in summarily [*5]denying his motion (see People v Jones, 155 AD3d at 1105; People v Farley, 184 AD2d 726, 727 [1992], lv denied 81 NY2d 762 [1992]).
Nor did County Court abuse its discretion in admitting into evidence certain photographs seized from defendant's cellular phone. "Unless photographs lack probative value and are presented solely for the purpose of inflaming a jury, they are admissible in a criminal trial, particularly where they tend to support a material issue or corroborate other evidence in the case" (People v Molineaux, 156 AD3d 1250, 1252 [2017] [internal quotation marks and citations omitted], lv denied 31 NY3d 1085 [2018]; see People v Pobliner, 32 NY2d 356, 370 [1973], cert denied 416 US 905 [1974]). "Once a relevant purpose for a photograph is demonstrated, the question of whether the probative value of the photograph outweighs any prejudice to the defendant rests within the trial court's sound discretion" (People v Brinkley, 174 AD3d 1159, 1165 [2019], lv denied 34 NY3d 979 [2019] [citation omitted]). The photographs from defendant's cell phone were not inflammatory in nature, were directly relevant to establishing his ownership and control over the various contents of the bag, and their probative value outweighed any risk of undue prejudice (see People v Brinkley, 174 AD3d at 1165; People v Silva, 135 AD3d 498, 498 [2016], lv denied 28 NY3d 936 [2016]). Moreover, County Court gave an appropriate limiting instruction with regard to evidence of the uncharged Mossberg, stating that "[p]ossession of the Mossberg firearm is not a crime [in New York]" and evidence relating to the Mossberg "must not be considered for the purpose of proving that . . . defendant had a propensity . . . to commit the crimes charged," but was instead being offered as evidence "on the question of identity, ownership, and possession of the contents of the . . . bag." We are satisfied that this limiting instruction dissipated any prejudice to defendant from admission of the photograph of the Mossberg.
Defendant's challenge to County Court's Sandoval ruling is also unavailing. County Court ruled that, if defendant chose to testify at trial, the People would be permitted to introduce evidence that he had been convicted of a prior unspecified felony and two prior robberies, but not about the underlying facts of the crimes. These convictions were probative of defendant's credibility and willingness to put his interests above those of society. Although these convictions were temporally remote — having occurred between 1995 and 1998 — the court noted that defendant had been incarcerated for 24 of the last 27 years. Notably, the record establishes that defendant was incarcerated from his last conviction in 1998 until March 2017, meaning that he had been at liberty for approximately 10 months before the instant offense. Under these circumstances, and considering the court's decision to preclude inquiry into the underlying facts of the convictions, we discern no abuse [*6]of discretion (see People v Delbrey, 179 AD3d 1292, 1296 n 2 [2020], lv denied 35 NY3d 969 [2020]; compare People v Cole, 177 AD3d 1096, 1100 [2019], lv denied 34 NY3d 1015 [2019]).
County Court also did not abuse its discretion in permitting the People to play the victim's 911 call at trial. Contrary to defendant's contention, even though the victim did not testify on the retrial, admission of the 911 call did not violate his right of confrontation under Crawford v Washington (541 US 36 [2004]), as "statements made in response to police inquiries for the primary purpose of enabling them to meet an ongoing emergency, rather than for providing evidence for a later prosecution, are deemed to be nontestimonial in nature and, thus, do not violate the Confrontation Clause" (People v Haskins, 121 AD3d 1181, 1184-1185 [2014], lv denied 24 NY3d 1120 [2015]; see People v Nieves-Andino, 9 NY3d 12, 14-15 [2007]). Moreover, County Court properly determined that the victim's statements on the call were admissible under the hearsay exceptions for present sense impressions and excited utterances. During portions of the call, the victim spontaneously described some of defendant's movements and actions in real time and her descriptions were generally corroborated by independent evidence. Such statements constituted present sense impressions (see People v Jones, 28 NY3d 1037, 1039 [2016]; People v Brown, 80 NY2d 729, 733-734 [1993]).
The victim's statements on the call also fell within the excited utterance exception to the hearsay rule. Although the victim's tenor and demeanor did not appear overly frantic, she explained to the dispatcher that she had removed herself from defendant's presence and retreated to her car in response to defendant kicking her door in and pushing her to the floor. She also relayed her fear that defendant was armed with a weapon. The dispatcher who received the victim's 911 call relayed his opinion that she sounded "very excited" and "very nervous" when he spoke to her. After considering the victim's statements on the 911 call and the circumstances prompting her to leave her residence, we are satisfied that the victim's call was made "under the stress and excitement of a startling event and [was] not the product of any reflection and possible fabrication" (People v Haskins, 121 AD3d at 1184 [internal quotation marks omitted]; see People v Johnson, 1 NY3d 302, 306 [2003]; People v Prashad, 297 AD2d 352, 352 [2002], lv denied 99 NY2d 563 [2002]). Although there was a brief break in time from when the victim removed herself from defendant's presence and when she placed the call, "the psychological and emotional effect of [a] sudden event may persist and continue to operate with undiminished force for a period of time thereafter" (People v Brown, 70 NY2d 513, 521 [1983]). A police officer who encountered the victim sitting in her vehicle when he arrived at the scene described her as "obviously nervous," noting that she was "sweating[*7]" and had "hand tremors" and "shortness of breath." Accordingly, County Court did not abuse its discretion in admitting into evidence the 911 call.
We are also unpersuaded by defendant's argument that County Court committed reversible error in granting the People's request for a curative instruction in response to defense counsel's statement during summation that the People had failed to call the victim to testify. Counsel is generally afforded "wide latitude" on summation (People v Rupnarine, 140 AD3d 1204, 1205 [2016]) and "[a] defendant not necessarily entitled to a missing witness charge may nonetheless try to persuade the jury to draw inferences from the People's failure to call an available witness with material, noncumulative information about the case" (People v Williams, 5 NY3d 732, 734 [2005] [emphasis added]; see People v Tankleff, 84 NY2d 992, 994-995 [1994]). Here, however, the victim was unavailable to testify for them on the retrial [FN6] and, therefore, County Court did not err in instructing the jury — in response to defense counsel's summation noting the victim's absence — that it "must not draw any inference favorable or unfavorable to either side from the fact that the victim was not called as a witness in the case" (see People v Wood, 245 AD2d 200, 201 [1997], lv denied 91 NY2d 946 [1998]; People v Parks, 237 AD2d 105, 105 [1997], lv denied 90 NY2d 862 [1997]; People v Ramirez, 221 AD2d 178, 179 [1995], lv denied 87 NY2d 1023 [1996]). In any event, we would find that any error in giving the curative instruction was harmless in light of the overwhelming proof of defendant's guilt (see People v McCollough, 16 AD3d 183, 184 [2005], lv denied 4 NY3d 855 [2005]; compare People v Williams, 5 NY3d 732, 735 [2005]).
We also reject defendant's assertion that he was deprived of the effective assistance of counsel. Although defendant takes issue with counsel's failure to secure a Mapp/Dunaway hearing, he did not demonstrate that counsel lacked a strategic reason for the manner in which he crafted the written suppression motion (see People v Santana, 179 AD3d 1299, 1302 [2020], lv denied 35 NY3d 973 [2020]), and "[t]here can be no denial of effective assistance of trial counsel arising from counsel's failure to make [an] argument that has little or no chance of success" (People v Caban, 5 NY3d 143, 152 [2005]). Here, the bag was located on a common stairwell and was partially open at the time it was found, thereby negating any reasonable expectation of privacy (see People v Febo, 167 AD3d 451, 452 [2018], lv denied 33 NY3d 948 [2019]). Moreover, defense counsel's purported advice to defendant not to testify "implicates strategic discussions between defendant and counsel that are dehors the record . . . [and] unreviewable on direct appeal" (People v Sanders, 289 AD2d 101, 102 [2001], lv denied 97 NY2d 760 [2002]). Nor was counsel ineffective in failing to request a missing witness charge pertaining to the People's failure to call the [*8]victim to testify, as the circumstances surrounding her absence made it highly unlikely that such a request would have been successful (see People v Caban, 5 NY3d at 152; People v Smith, 157 AD3d 978, 982 [2018], lv denied 31 NY3d 1087 [2018]). As the record demonstrates that counsel "presented a clear trial strategy, effectively cross-examined witnesses and made appropriate opening and closing statements," we are satisfied that defendant was provided with meaningful representation (People v Santana, 179 AD3d at 1302; see People v Seecoomar, 174 AD3d 1154, 1158 [2019], lv denied 34 NY3d 1019 [2019]).
Finally, we reject defendant's contention that the sentence imposed was harsh and excessive. The five-year disparity between the pretrial plea offer and the sentence ultimately imposed does not support defendant's assertion that he was penalized for asserting his right to trial (see People v Martinez, 26 NY3d 196, 200 [2015]; compare People v Cosme, 203 AD2d 375, 376 [1994]). Given defendant's prior criminal history for serious charges and the circumstances precipitating the underlying convictions, we discern no abuse of discretion or extraordinary circumstances that would warrant a reduction of the sentence in the interest of justice (see People v Gabriel, 155 AD3d 1438, 1442 [2017], lv denied 31 NY3d 1081 [2018]). However, we note that the uniform sentence and commitment form does not reflect defendant's status as a second violent felony offender, as found by County Court during the sentencing hearing. It should therefore be amended accordingly (see People v Sanders, 185 AD3d 1280, 1287-1288 [2020], lv denied 35 NY3d 1115 [2020]).
Garry, P.J., Egan Jr., Clark and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment is affirmed, and matter remitted for entry of an amended uniform sentence and commitment form.



Footnotes

Footnote 1: None of the weapon possession charges related to defendant's possession of the Mossberg, which was not designed to be fired from the shoulder and therefore does not constitute a firearm that can be charged under Penal Law article 265 (see Penal Law § 265.00 [3] [b]; [12]).

Footnote 2: Count 4 of the indictment — charging criminal possession of a weapon in the fourth degree — was dismissed upon stipulation of the parties following the close of the People's case-in-chief.

Footnote 3: The sentences were ordered to run consecutively to the sentence imposed on a parole violation.

Footnote 4: Although defendant asserts that he resided at the victim's apartment prior to the underlying incident, the "home exception embodied in Penal Law § 265.03 (3), which provides that possession of a loaded firearm within one's own home generally does not constitute a violation of that subdivision, is inapplicable to defendant, given that he has been previously convicted of a crime" and the firearm was found outside of the apartment (People v McCoy, 169 AD3d 1260, 1262 n 1 [2019], lv denied 33 NY3d 1033 [2019]; see People v Jones, 22 NY3d 53, 57-59 [2013]; see also Penal Law § 265.02 [1]).

Footnote 5: The remaining elements of these crimes — that defendant had a prior criminal conviction and that the handgun was "loaded" within the meaning of Penal Law § 265.00 (15) — were established through defendant's admission that he had previously been convicted of manslaughter in the first degree and by evidence that ammunition for the handgun was also found in the bag.

Footnote 6: To that end, the victim's attorney informed the People of her intent to "refuse to answer any questions" if called to testify at the retrial — as she did during defendant's first trial — and she had been indicted on criminal contempt charges for refusing to testify during the grand jury proceedings on the underlying indictment (see generally People v Savinon, 100 NY2d 192, 199 [2003]; People v Hernandez, 256 AD2d 18, 19 [1998], lv denied 23 NY2d 874 [1999]).